*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHELLE ELLISON,

        Plaintiff/Counterdefendant-Appellee,

UNPUBLISHED
December 7, 2023

v

ANTONIO MARTINEZ,

        Defendant/Counterplaintiff-Appellant.

No. 364226
Bay Circuit Court
Family Division
LC No. 2015-007148-DC

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Defendant Antonio Martinez appeals as of right the order of the trial court denying his motion to change custody and granting plaintiff Michelle Ellison's motion to change custody. We affirm.

## I. BACKGROUND

This case concerns competing motions to change custody of the parties' minor child, RM. RM has moderate to severe Down syndrome and autism, and requires special and extensive care for these disabilities. RM was born in late March 2009, and the parties, although never married, appear to have been in a relationship until approximately October 2014. In late March 2015, several months after the parties ended their relationship, Ellison moved, in part, for sole legal and physical custody. In her motion, Ellison alleged that Martinez had anger issues and was "very abusive" to her. Martinez denied these allegations and sought sole legal and physical custody of RM. In August 2015, the trial court granted the parties joint legal and physical custody, and ordered parenting time on an alternating-week schedule. As part of its custody order, the trial court held child support in abeyance but required both parties to carry insurance for health care and medical support.

The case appears to have been dormant from the August 2015 order until September 2021 when the trial court, on its own motion, determined that the COVID-19 pandemic may have caused a change of circumstances warranting revisiting the support obligation. The order appears to have sought information from the parties regarding whether the pandemic had caused them to "suffer[] adverse effects" that "significantly impact[ed] what the support obligation should be," and ordered

-1-

any modification be retroactive to October 1, 2020, or "to such later date any adverse effects occurred." Shortly after the court entered the September 2021 order, Martinez, in October 2021, again moved for a change of custody. He argued that Ellison was not properly caring for RM and did not take RM to medical appointments, canceled appointments, and failed to show up for appointments. Martinez also argued that Ellison was often late when returning RM to him, and that RM's development had stagnated under her care. Martinez sought sole legal and physical custody.

In December 2021, Ellison also moved for a change of custody. Related to RM, she argued that Martinez did not consistently exercise parenting time, that RM did not behave well under Martinez's care, and that Martinez did not fully understand the nature of RM's disabilities and limitations. Ellison also raised issue with Martinez's alleged acts of violence. She asserted that in May 2021, Martinez violently attacked her husband, Greg Ellison (who she had married in 2018), that Martinez had been arrested in December 2019 for domestic violence against his girlfriend, and that he was facing an assault-and-battery charge related to the May 2021 incident with Greg. Ellison sought sole legal and physical custody.

The trial court conducted a hearing on the parties' motions over the course of three nonconsecutive days in January 2022, April 2022, and November 2022. At the first day of the hearing, Martinez was unrepresented. Since the entry of the custody order in August 2015 and the first hearing in January 2022, RM had attended four programs that provided services for disabled children. RM changed therapists multiple times. Ellison did not want RM to change programs or therapists so many times, but Martinez often insisted, sometimes making these changes unilaterally. Ellison desired consistency for RM.

While attending the Living and Learning Center (Living and Learning), RM received speech and occupational therapy. Living and Learning offered Applied Behavioral Analysis (ABA) therapy, an evidence-based method for helping children with autism and other disabilities, and full school days. Living and Learning's principal, Jennifer Ayers, testified that Martinez often caused issues at the facility, harassed staff, and was banned from the premises. She described an incident in which Martinez bypassed the entrance area and went back to the classrooms, improperly took photographs inside of a classroom while standing outside the classroom door (violating Living and Learning's confidentiality policies), and refused to leave. According to Ayers, Martinez became angry and upset during this incident, and made her fearful that he may attack her. Ayers explained that, as a result of this incident, Living and Learning changed many of its protocols related to parental access to the facility and end-of-the-day procedures for returning children to their parents. She also noted that the facility built a new wall in the entrance area to prevent parents from accessing other areas of the building.

Ellison and Martinez eventually mutually agreed to remove RM from Living and Learning and moved him to a second program with Centria. Martinez, however, unilaterally removed RM from Centria after only a few months because Martinez did not like the program. He placed RM in a third program with the Autism Center, only to remove him shortly after for the same reasons. On both occasions, Ellison opposed removing RM from the programs. RM began at the fourth program with Game Changer Therapy Services (Game Changer) at some point in 2018. The case supervisor of RM's development at Game Changer, Breanna Hodgins-Volk, testified that she began working with RM in September 2021 and that a total of five people had previously overseen

RM's development. She explained that at least some of those five people were "removed" from providing care to RM because of issues with Martinez. Hodgins-Volk was reluctant to answer questions involving incidents with Martinez out of a desire not to alienate Martinez or impact RM's care. Approximately a week after her testimony, she stopped supervising RM due to problems with Martinez.

Around the time of the January 2022 hearing, Martinez wanted to remove RM from Game Changer for lack of progress and move him to a different program. Both Ellison and Hodgins-Volk opposed this because RM had built a foundation in the program and needed consistency. Hodgins-Volk testified that RM was making progress and that the program would continue to do all it could for him. Ellison similarly testified that RM was doing well there. Game Changer had, however, discontinued RM's speech therapy because of, as Hodgins-Volk described it, a "lack of motivation" and the speech therapist had not "seen progress in two years." But Game Changer still worked with RM using sign language and a communication device. According to Hodgins-Volk, RM was also receiving physical therapy at Game Changer.

Martinez introduced graphic photographs of RM at Ellison's home. Jeremy Oldham, who shared a child with Ellison and previously had his own custody case with her, testified that, in previous years, Ellison often left RM alone in a bedroom for hours at a time and did not properly care for him. Oldham testified that he reported this to Children's Protective Services (CPS). Though CPS investigated the photographs and allegations in 2017, it found no wrongdoing and dismissed the case. Ellison explained that this investigation occurred at a time when her relationship with Oldham had soured.

The parties disagreed about how independent RM could become. Martinez believed RM could eventually do many things by himself. Ellison and Hodgins-Volk, on the other hand, believed Martinez had unrealistic expectations. Ellison believed that RM would never be completely independent, and indicated that contrary to Martinez's statements, RM was not fully potty trained. She also indicated RM could not do "basic things" on his own like "car[e] for himself," or "go get" or "make" food. The parties also had trouble communicating with each other and coparenting effectively. Both parties accused the other of making medical appointments and decisions without the other's knowledge. Ellison also testified that Martinez often verbally abused her, and that she was uncomfortable having one-on-one conversations with him.

Martinez acknowledged his 2019 arrest for domestic violence, but testified that he had not been convicted. He also acknowledged that in May 2021 he had a physical altercation with Ellison's husband, Greg Ellison. Martinez's account of this altercation, however, differed from that of Ellison and her neighbor. According to Martinez, Greg was the aggressor and pulled a knife on him, causing Martinez defend to himself. But according to Ellison and her neighbor, Martinez initiated the altercation by pushing Greg, and no knife was involved. Both Ellison and the neighbor testified that they saw Martinez punch Greg multiple times. Ellison indicated that Greg sustained a broken nose, a sprained ankle, a bruised tailbone, scratches, and bruises. This incident led to assault-and-battery charge against Martinez that was pending at the time of the hearing.

Approximately a week after the January 2022 hearing, Hodgins-Volk stopped overseeing RM's development because of issues she had with Martinez. As of the April 2022 hearing, RM

had "recently been discharged" from Game Changer. Ellison testified that she was told it was because he "ha[d] not made enough progress there." Martinez and Ellison discussed enrolling RM in a fifth program, Encompass, but it had a four- to six-month waitlist. As of the April 2022 hearing, RM was not receiving therapy, and Martinez had been convicted of assault for his altercation with Greg and was awaiting sentencing. Ellison testified that, since the first day of the hearing, Martinez had also been arrested for resisting a police officer.[1] At the end of the April 2022 hearing, the trial court found that the "acrimony" between the parties provided proper cause to revisit custody.

By the third day of the hearing in November 2022, RM was attending Encompass and had been there since at least June 2022. Ellison testified that Martinez never informed her about RM's initial evaluation at Encompass and that she did not learn about it until a month after he began attending. RM's occupational therapist at Encompass, Dana Berthiaume, testified that RM had progressed well in therapy. She indicated that RM had made progress "entering the building," "sitting and attending to different work tasks that we have in front of him," "moving around various areas of the building and going into various rooms," and using the bathroom. RM's speech therapist at Encompass, Kayleigh Luttrell, similarly testified that RM had progressed well in therapy. Luttrell worked with RM on his use of his communication device (which uses an "icon[]" system, such as "go" and "walk") and gestures (like shaking his head), as well as his "response to directives" and "imitating gross motor movements . . . ." Both therapists worked with RM three days a week, each for 30 minutes a day. Neither therapist had any issues with Martinez. Though RM was on a waitlist for ABA therapy at Encompass, it did not offer physical therapy. Ellison's only concern with the program was that RM was not yet receiving ABA therapy.

The trial court granted Ellison's motion for a change of custody and denied Martinez's motion. The court determined that an established custodial environment existed with both parties. The trial court examined the best-interest factors under the Child Custody Act of 1970, MCL 722.21 *et seq*., determining that Factors (b), (c), (f), (h), (k), and (*l*) favored Ellison, that Factor (e) slightly favored Ellison, and that Factors (a), (d), (g), (i), and (j) did not favor either party. The court's primary concern was Martinez's disruptive conduct with the various programs, and the delays and inconsistencies it created for RM's therapy and development. The trial court also expressed concern over Martinez's criminal history and his altercation with Greg. This appeal followed.

## II. STANDARD OF REVIEW

We review custody decisions for an abuse of discretion. *Vodvarka v Grasmeyer*, 259 Mich App 499, 507-508; 675 NW2d 847 (2003). An abuse of discretion occurs "when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Shade v Wright*, 291 Mich App 17, 21; 805 NW2d 1 (2010) (quotation marks and citation omitted). For findings of fact, we apply the great weight of the evidence standard. *Vodvarka*, 259 Mich App at 507. Under this standard, the trial court's findings "should be affirmed unless the evidence clearly preponderates in the opposite

---

[1] According to Ellison's attorney, Martinez pleaded guilty to the assault-and-battery charge related to Greg in exchange for the dismissal of his charge of resisting and obstructing an officer.

direction." *Id*. (quotation marks and citation omitted). "Questions of law are reviewed for clear legal error," which occurs when the trial court "incorrectly chooses, interprets, or applies the law." *Id*. at 508 (quotation marks and citations omitted).

## III. CHILD'S BEST INTERESTS

Martinez argues that the trial court erred in its findings and should have weighed the best-interest factors in his favor. He does not, however, specify which factors should have weighed in his favor. With the exception of factor (g) (health issues of either party), we disagree with Martinez and address each factor in turn.

At the outset, many of Martinez's arguments on appeal relate to matters of credibility and weight. He repeatedly argues that the trial court erred because it did not assign more weight or credibility to his evidence and testimony. Martinez also often disagrees with the trial court's findings. But we must give regard "to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). We also defer to the trial court's findings of credibility. *Gagnon v Glowacki*, 295 Mich App 557, 568; 815 NW2d 141 (2012). Our review is therefore constrained to whether the trial court's findings were against the great weight of the evidence. See *Vodvarka*, 259 Mich App at 507. To the extent Martinez raises matters outside the record or references events that have purportedly occurred *after* the trial court's decision, our review is limited to the record developed by the parties and the trial court, and we decline to address them. See *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002) ("This Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal").

When seeking a change of custody, a party must first show by a preponderance of the evidence that either a proper cause or a change of circumstances warrants the change. *Vodvarka*, 259 Mich App at 508-509. This showing must be made before the trial court may "consider whether an established custodial environment exists (thus establishing the burden of proof) and conduct a review of the best interest factors." *Id*. at 509. The trial court found that proper cause existed (the "acrimony" between Ellison and Martinez) and warranted evaluating whether a change in custody was justified. The parties do not dispute the trial court's finding regarding proper cause.

Once the trial court makes this initial determination, it determines whether there is an established custodial environment, then it reviews the statutory best-interest factors. *Id*. at 509. "The established custodial environment is the environment in which 'over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort.' " *Pierron v Pierron*, 486 Mich 81, 85-86; 782 NW2d 480 (2010), quoting MCL 722.27(1)(c). If the proposed change "would change the established custodial environment of a child, the moving party must show by clear and convincing evidence that it is in the child's best interest." *Shade*, 291 Mich App at 23. The trial court found that there was an established custodial environment with both parents and that a change in custody would change that environment, so the clear-and-convincing standard applied. See *id*. The parties do not challenge this conclusion on appeal.

The focus of this appeal is on the trial court's best-interests determination. MCL 722.23 outlines the 12 statutory factors courts must evaluate when making this determination:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23(a) through (*l*).]

"Generally, the trial court must consider and explicitly state its findings and conclusions regarding each factor, and the failure to do so is usually error requiring reversal." *LaFleche v Ybarra*, 242 Mich App 692, 700; 619 NW2d 738 (2000) (emphasis added). As indicated, Martinez does not provide arguments about specific factors. He instead argues generally that the trial court's best-interests determination "favored the wrong parent." We therefore address each best-interest factor in turn.

## A. FACTOR (A)

The great weight of the evidence supported the trial court's findings for factor (a). Factor (a) is the "love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The trial court found: "Both parents, I find from the evidence, love this child. There are bonds between this child and both parents. I don't find that that factor favors either party." The record supports the trial court's findings. Ellison testified that she loved RM and that she believed Martinez loved him too. The great weight of the evidence demonstrates that both parties loved RM and desired what they respectively believed was best for him. Martinez has not shown otherwise.

## B. FACTOR (B)

The great weight of the evidence supported the trial court's findings with respect to factor (b), which considers the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). At the beginning of its findings on the record, the trial court found that RM needed "very particularized and skilled care" but that Martinez had "been an impediment to that kind of help." The trial court found: "I find that the difficulties . . . that Mr. Martinez, that I've described before, created with the schools . . . the programs that [RM's] been involved in causes this factor to favor [Ellison]." The evidence supported these findings.

The trial court determined that Martinez was "disruptive" to RM's time at Living and Learning, which led to Martinez's "ban[] from the premises." The trial court was also concerned about Martinez's conduct toward Game Changer and how the "relationship was ruptured because of disputes between the staff" and Martinez. The trial court noted that RM was then-currently attending Encompass but was concerned that it did not offer the same type of therapy as the other programs.[2] The court found that RM was "not getting that very important therapy [ABA]," which it found to be "a result of the difficulties that arose with the other programs."

The record supports these findings. RM had been to five facilities since 2015, and the constant changes disrupted his therapy and development. At times, Martinez changed facilities without Ellison's knowledge or approval. He had several issues with the facilities and their staff, especially with Living and Learning and Game Changer. Martinez's conduct at Living and Learning led to him being banned from the premises. It also caused the program to adopt new protocols and construct a wall in the entrance area. His actions at Game Changer led to six different people overseeing RM's development at various times, and he engaged in conduct that made staff feel unsafe. RM received more types of therapy and longer sessions at Living and Learning and Game Changer as compared to Encompass. Martinez's actions were a main factor in the removal of RM from his previous programs and his placement with Encompass, a program that not only lacked transportation services but also limited RM to only three hours of services per week. And, while RM waited to join Encompass he did not receive any other form of therapy.

---

[2] The court stated that "Encompass does not have a—applied behavioral curriculum." One of RM's therapists at Encompass confirmed that Encompass has an "ABA" (Applied Behavioral Analysis) program but that RM was on the waitlist.

Ample evidence therefore supported the trial court's findings that Martinez's actions played a significant role in the disruption of RM's therapy and development. In contrast, no evidence showed that Ellison had any issues with these facilities or wanted RM to attend different programs (other than the parties' mutual agreement to remove RM from Living and Learning). RM had severe disabilities, and Martinez's actions prevented his child from receiving the consistency of, and development associated with, remaining with a single program. The trial court's findings regarding factor (b) were therefore not against the great weight of the evidence.

## C. FACTOR (C)

Factor (c) is the "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court found:

> Well, to the extent that we're talking about support and to the extent that we're talking about medical care, I don't find that this favors either party, but I do find that the disagreements over his schooling and the . . . difficulties that have been created by Mr. Martinez's conduct toward the staff at these schools does cause this factor to favor [Ellison].

Though the trial court found that this factor did not favor either party to the extent it considered support and medical care, it determined that Martinez's conduct led the factor to favor Ellison. This was not against the great weight of the evidence. As discussed, the record shows that Martinez was disruptive toward RM's care at various facilities and often had conflict with the staff. In contrast, Ellison had no issues with these facilities and did not want RM to move between so many programs. RM had a "material need[]" to participate in these programs; they helped further his development and strengthened his abilities. Martinez's conduct demonstrated he was not capable of, or disposed to, providing for RM's material needs. To the extent that the trial court's findings under factor (c) overlap with factor (b)—or any other factors—we have previously held that "the factors have some natural overlap." *Fletcher v Fletcher*, 229 Mich App 19, 24-25; 581 NW2d 11 (1998) (concluding that the trial court was free to consider evidence under factor (a) that was also relevant under factor (j)). That the trial court decided to emphasize its concern with Martinez's conduct under multiple factors was not erroneous. The trial court's findings regarding factor (c) were therefore not against the great weight of the evidence.

## D. FACTOR (D)

Factor (d) is the "length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." MCL 722.23(d). The trial court found:

> Well, as far as the home environment's concerned, I think both parents have provided an adequate physical home, and . . . I think it's desirable that that continue. There have been allegations that [Martinez]'s home is unclean, but that, in my judgment, hasn't been proven. I find that favors neither parent.

Both parties appeared to have adequate housing. Although CPS previously investigated Ellison's home and her care of RM, CPS dismissed the investigation after finding no wrongdoing. And to the extent that Oldham's testimony touched on issues with Ellison's care of RM, the trial court

expressed skepticism of Oldham's credibility because of his past conflict with Ellison in his own custody case with her. The trial court's finding that this factor favored neither party was not against the great weight of the evidence.

## E. FACTOR (E)

Factor (e) is the "permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). The trial court found:

> [Martinez] is single. He at one time lived with the mother of his younger child. There were allegations of domestic violence in that relationship, but no charge were [sic] substantiated. [Ellison] reports she's been married since 2018 to her husband. They reside together, along with another daughter from a different relationship. I think her relationship has been more stable. That slightly favors [Ellison].

The trial court's findings regarding factor (e) were not against the great weight of the evidence. Ellison had been married to her husband for four years and had a daughter from her past relationship with Oldham. Martinez was unmarried and shared a child with another woman, though they were no longer in a relationship. Martinez testified that this woman was the primary person who helped him care for his children, including RM. He also acknowledged having been arrested for domestic violence, though he was never convicted. The parties therefore both had prior relationships and children with other people, but Ellison was in a stable marriage and had not been arrested for domestic violence. Accordingly, the great weight of the evidence supported the trial court's findings under this factor.

## F. FACTOR (F)

Factor (f) is the "moral fitness of the parties involved." MCL 722.23(f). The trial court found that factor (f) favored Ellison. In doing so, it found that Martinez had a "history of a criminal record" and Ellison did not. The trial court also noted Martinez's altercation with Greg that resulted in a conviction. As stated, Martinez was arrested for domestic violence and for resisting a police officer. He was also convicted of assaulting Ellison's husband in a violent attack that resulted in extensive injuries to Greg. RM and Ellison's other minor daughter were present when the assault occurred. Although Martinez on appeal relies on his version of events, the trial court evidently found Ellison and her neighbor more credible. Credibility determinations are the province of the trial court and we will not disturb them on appeal. See MCR 2.613(C); *Gagnon*, 295 Mich App at 568.

## G. FACTOR (G)

Martinez contends that the trial court erroneously found that there was no evidence of health issues of either party. Without identifying the specific document, Martinez asserts that a "document in [their] file" indicates that Ellison has fibromyalgia. We agree with Martinez.

Factor (g) is the "mental and physical health of the parties involved." MCL 722.23(g). The trial court found that this factor favored neither party. The court stated: "I haven't heard any allegations of . . . significantly serious problems with either. . . . [A]nd there's certainly no evidence of that. This is not going to favor either parent." Though there did not appear to be any

testimony or arguments about fibromyalgia, a 2017 CPS investigatory report indicates that Ellison acknowledged having fibromyalgia. According to the dispositional findings of the report, Ellison "admitted to having memory and judgment issues due to her fibromyalgia." The trial court's finding that there was no evidence of health issues was therefore against the great weight of the evidence. There was, however, no evidence of any such issues for Martinez. We therefore conclude that this factor should not have been neutral, but instead properly favored Martinez.

## H. FACTOR (H)

Factor (h) is the "home, school, and community record of the child." MCL 722.23(h). The trial court found that RM "fac[ed] some serious, serious challenges" and that Ellison was "better equipped to provide him with adequate programming in light of [Martinez's] difficulty with the . . . staff at all of these programs, and therefore, I find this favors [Ellison]." As noted, the evidence established that Martinez had several issues with the facilities where RM attended therapy and their respective staff. In contrast, Ellison had no such issues, and she did not want to remove RM from the prior facilities. And, as discussed, Martinez often made unilateral decisions about whether RM would remain or go to another program. The trial court's finding that factor (h) favored Ellison was not against the great weight of the evidence.

Martinez argues that Ellison was not involved when RM attended these facilities. The record does not support his position. Ellison testified that she was active at Game Changer, a program that RM attended for approximately four years. Ellison and RM's therapists at Encompass each testified that Ellison's work schedule prevented her from visiting during RM's sessions. But Ellison also testified that she regularly communicated with Encompass staff about RM's progress, and Berthiaume testified that she had discussed RM's progress with Ellison. Ellison and Hodgins-Volk also expressed concerns that Martinez had unrealistic expectations for RM. The evidence therefore demonstrated that Ellison was an involved parent with respect to RM's attendance at the various facilities.

## I. FACTOR (I)

Factor (i) is the "reasonable preference of the child, if the court considers the child to be of sufficient age to express preference." MCL 722.23(i). The trial court found that this did not favor either party because RM could not express a preference. Given RM's disabilities, this was not erroneous, and Martinez does not now contend otherwise.

## J. FACTOR (J)

Factor (j) is the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j). The trial court found: "I don't find that either parent is trying to undermine the relationship between [RM] and the other parent. I'm not going to find that that favors one or the other." Although the parties disagreed on many things and have had difficulty communicating, there was no evidence that either interfered with the other's relationship with RM. The parties had exercised their court-ordered parenting time and worked to change the schedule as needed. Martinez does not appear to make any argument to the contrary on appeal. The trial court's finding that this factor was neutral was not against the great weight of the evidence.

## K.  FACTOR (K)

Factor (k) is "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k).  The trial court found:

> There is no allegation in [Ellison]'s home of any domestic violence.  There's certainly not been any evidence of it.  There was an allegation of assault and battery by . . . Mr. Martinez's former partner.  [Ellison] reports that that was witnessed by herself, [RM], and her [minor] daughter . . . .  That was the assault, I should say, against Ms. Ellison's husband, and I find that that favors, because of that, [Ellison].

The Child Custody Act of 1970 does not define "domestic violence."  In *Brown v Brown*, 332 Mich App 1, 10-12; 955 NW2d 515 (2020), however, we held that the definition of domestic violence in MCL 400.1501(d) applied to domestic violence under MCL 722.23(k).  Under 400.1501(d), domestic violence includes "[c]ausing or attempting to cause physical or mental harm to a family or household member" and "[p]lacing a family or household member in fear of physical or mental harm."  MCL 400.1501(d)(*i*) and (*ii*).  It also includes "[e]ngaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested."  MCL 400.1501(d)(*iv*).  A "[f]amily or household member" is defined to include a person with whom somebody has a child in common and the minor child of such a person.  MCL 400.1501(e)(*vi*) and (*vii*).

Martinez argues that there was no evidence of domestic violence.  But he ignores his own testimony that he was arrested for domestic violence in 2019.  Although there was no evidence of a conviction, MCL 400.1501 does not require one.  Furthermore, Martinez's attack on Ellison's husband also qualifies as domestic violence.  Ellison, her minor daughter, and RM were present for the attack.  Ellison testified that, as Martinez attacked her husband, she attempted to protect her daughter and "was trying to stay out of the way" because she "didn't know what was going to happen to me."  Martinez's actions placed Ellison in fear of physical harm and would cause a reasonable person to feel frightened or threatened.[3]  In contrast, there was no evidence of Ellison committing domestic violence.  The trial court's findings regarding factor (k) were therefore not against the great weight of the evidence.

## L.  FACTOR (L)

Finally, Factor (*l*) is "[a]ny other factor considered by the court to be relevant to a particular child custody dispute."  MCL 722.23(*l*).  The trial court found: "I think that my main concern, as

---

[3] Ellison also testified that Martinez had verbally abused her since entry of the custody order in August 2015, referencing text messages in which Martinez called her "a bad mother" and saying that she "wasn't doing a good job . . . ."  This too could potentially qualify as "domestic violence" under the statutory definition, which includes acts that cause or attempt to cause mental harm, see MCL 400.1501(d)(*i*), or harassment, see MCL 400.1501(d)(*iii*), as it attacked Ellison's abilities as a mother and may have caused mental harm to her.

-11-

I said, is the disruption to these important services that Mr. Martinez, through his conduct, has . . . caused. And . . . I guess that's contained within the factors."

The trial court was primarily concerned with Martinez's conduct involving the various programs in which RM was placed, a concern it expressed in its evaluation of several factors. Extensive evidence supported this concern. Here, the trial court chose to reiterate its concerns with Martinez's conduct and how it negatively affected RM's development. This was not improper. See *Fletcher*, 229 Mich App at 24-25. There was no dispute that RM had severe disabilities that required consistent care and therapy. Martinez's actions caused RM to constantly move and adjust to new environments and new staff. This included removal of RM from Game Changer, where he had spent four years building a foundation. Hodgins-Volk stressed the importance this foundation had for RM, testifying that it "would be rough to pull him out of something that is consistent . . . ." And, as discussed, while waiting to restart at a new program (Encompass), RM received no therapy whatsoever. We conclude that the trial court's findings related to factor (*l*) were not against the great weight of the evidence.

In conclusion, the trial court found that seven of the best-interest factors either favored or slightly favored Ellison. Only its findings regarding factor (g) (the mental and physical health of the parties involved) were against the great weight of the evidence. That factor should have instead favored Martinez. The remaining five factors favored both parties equally. Although the trial court's findings related to factor (g) were against the great weight of the evidence, the remaining factors either favored Ellison or were neutral. We therefore conclude that Martinez has not met his burden to show that the trial court abused its discretion when it granted Ellison's motion for a change of custody and denied his.[4]

We affirm.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado

---

[4] Martinez argues that the trial judge was biased against him. He failed to include this issue in his statement of questions presented, so the issue is waived and we decline to address it. See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019). See also MCR 7.212(C)(5).